## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: _____

MICHAEL SEXTON,
JAZZMEN LUEDERS,

      Plaintiffs,

v.

CITY OF COLORADO SPRINGS, COLORADO a municipality,
CHRISTINE SOMERSALMI, in his individual and official capacities,
EDDIE NASSAR, in his individual and official capacities,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Michael Sexton and Jazzmen Lueders, by and through his counsel, Andy McNulty of KILLMER, LANE & NEWMAN, LLP, hereby submits his Complaint and Jury Demand, and states as follows:

### INTRODUCTION

1.    Plaintiffs were subjected to excessive force by two Colorado Springs Police Department ("CSPD") officers simply because they exercised their First Amendment rights. This is not the first time that CSPD officers have targeted Mr. Sexton specifically, and others generally, for simply criticizing them. Colorado Springs has a disturbing pattern of using force against individuals in retaliation for questioning and criticizing CSPD officers. This disturbing

pattern and practice by Colorado Springs caused the violation of Mr. Sexton's and Ms. Lueder's constitutional rights, and they bring this lawsuit to vindicate them.

## JURISDICTION AND VENUE

2.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

3.      Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

4.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

5.      Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

## PARTIES

6.      At all times relevant to this Complaint, Plaintiff Michael Sexton was a citizen of the United States of America and a resident of the State of Colorado.

7.      At all times relevant to this Complaint, Plaintiff Jazzmen Lueders was a citizen of the United States of America and a resident of the State of Colorado.

8.      At all times relevant to this Complaint, Defendant City of Colorado Springs ("Colorado Springs") was a Colorado municipal corporation.

9.      At all times relevant to this Complaint, Defendant Christine Somersalmi was a
citizen of the United States and resident of the State of Colorado. At all relevant times,
Defendant Somersalmi was acting within the scope of his official duties and employment and
under color of state law in her capacity as a law enforcement officer for Colorado Springs,
Colorado. Defendant Somersalmi is a peace officer employed by a local government and,
therefore, is subject to suit under C.R.S. § 13-21-131.

10.      At all times relevant to this Complaint, Defendant Eddie Nassar was a citizen of
the United States and resident of the State of Colorado. At all relevant times, Defendant Nassar
was acting within the scope of his official duties and employment and under color of state law in
his capacity as a law enforcement officer for Colorado Springs, Colorado. Defendant Nassar is a
peace officer employed by a local government and, therefore, is subject to suit under C.R.S. §
13-21-131.

## FACTUAL ALLEGATIONS

11.      In the early morning hours on April 2, 2021, Mr. Sexton and Ms. Lueders were
asleep in their van. The van was parked in a dirt lot between South Tejon Street and South
Nevada Avenue, behind Natural Grocers. The lot contained no signage indicating it was a private
lot. It did not have signage requesting that they public not enter, indicate that there was no
parking there, or provide notice that there no camping at that site. In fact, the only sign on the
property gave notice of a development proposal by the Colorado Springs Urban Planning
Division for a subdivision plat.

12.      Around 2:00 a.m., Defendant Somersalmi and Defendant Nassar arrived to the lot.

13.     Defendant Somersalmi knew who Mr. Sexton was from the minute she arrived

on-scene. She had interactions with Mr. Sexton previously and knew that he was someone who

frequently criticized and filmed police activity. This knowledge influenced Defendant

Somersalmi's actions. Defendant Somersalmi recklessly escalated the situation with Mr. Sexton,

and recklessly created any need to use force, because of his past activities criticizing and filming

the police. Ultimately, Defendant Somersalmi used grossly excessive force against Mr. Sexton

and Ms. Lueders because Mr. Sexton was a known protester of police activity who often filmed

the police.

14.     Upon Defendants' arrival, both Mr. Sexton and Ms. Lueders began recording the

interaction on their cellphones. Defendant Somersalmi knew that Mr. Sexton and Ms. Lueders

were filming the encounter and this annoyed her. Defendant Somersalmi knocked on the van's

windows and asked Mr. Sexton to exit the van. Mr. Sexton questioned her authority to even

speak with him as there were no trespassing signs. Mr. Sexton also criticized Defendant

Somersalmi's interpretation of the law and, because of his discomfort with how Defendant

Somersalmi was escalating the situation, asked that Defendant Somersalmi call her supervisor

before he exited the van.

15.     In response to Mr. Sexton's reasonable request for Defendant Somersalmi to call

her supervisor, Defendant Somersalmi told Mr. Sexton that she would break his windows and

drag him out of his van. Mr. Sexton continuously replied that he, and Ms. Lueders, had not done

anything wrong and asked to speak with Defendant Somersalmi's supervisor.

16.    After a few minutes of back-and-forth, Defendant Somersalmi threatened to place Mr. Sexton under arrest for obstruction. At this point, Mr. Sexton exited the van. Mr. Sexton asked Defendant Somersalmi to back away from his vehicle.

17.    Instead, Defendant Somersalmi and Defendant Nassar grabbed Mr. Sexton by both arms. While Mr. Sexton was helpless, Defendant Somersalmi and Defendant Nassar slammed Mr. Sexton to the ground.

18.     The body slam fractured Mr. Sexton's right humorous.

19.    Ms. Lueders continued to record the interaction, and she was critical of the officers and told them to get off of Mr. Sexton multiple times.

20.    Immediately after handcuffing Mr. Sexton on the ground, Defendant Somersalmi went after Ms. Lueders. Defendant Somersalmi pulled Ms. Lueders' hair, grabbed her right arm, and pushed her face up against the van, leaving her bruised and scarred.

21.    It was clear to Defendant Nassar that there was no basis for Defendant Somersalmi to use any force against Plaintiffs. Defendant Nassar had the chance to intervene to stop Defendant Somersalmi's actions. Defendant Nassar actively chose not to take any action to intervene to de-escalate the situation or, at the very least, to prevent Defendant Somersalmi's from recklessly escalating the situation and creating any need to use force.

22.    Mr. Sexton and Ms. Lueders remained in handcuffs for forty-five minutes before they were released. After they were released, Mr. Sexton and Ms. Lueders were left alone on the very property they had just been arrested and brutalized for being on. It was clear that their presence on the property did not justify the use of force against them, and that Defendants used

grossly excessive force against them simply because they questioned Defendants and criticized their actions.

23.    Ultimately, Defendant Somersalmi's use of force, and Defendant Nassar's decision to not intervene, were based on Mr. Sexton's and Ms. Lueder's speech, including their criticism of Defendants and their filming of Defendants' actions.

24.    After Defendants left, Mr. Sexton and Ms. Lueders went to the Penrose Hospital Emergency Room. At the hospital, Mr. Sexton was diagnosed with a fracture in his upper right humerus. This was confirmed by two subsequent X-rays and a CAT scan.

25.    Mr. Sexton and Ms. Lueders were charged with trespass, resisting arrest, and obstructing a peace officer simply because they recorded the police interaction and criticized Defendants Somersalmi and Nassar. The charges for resisting and obstruction were later dismissed by the district attorney.

26.    After the incident, Mr. Sexton and Ms. Lueders each filed a complaint about this incident with Internal Affairs in Colorado Springs. The Internal Affairs complaint did not result in any discipline for Defendants. Defendant Colorado Springs concluded that all of the actions of Defendant Somersalmi and Defendant Nassar were in accordance with Defendant Colorado Springs' policies, customs, practices, and training.

**Defendant Colorado Springs has a custom and practice of targeting Mr. Sexton for engaging in speech that is critical of CSPD officers as evidenced by an incident on June 7, 2019.**

27.    On June 7, 2019, Mr. Sexton was leaving the 7-11 near the intersection of 30th Street and Colorado Avenue in Colorado, Springs, Colorado. As he stood in the parking lot, Officer Matthew Anderson, a CSPD officer, drove by in a police car.

28.    As Officer Anderson drove by, Mr. Sexton flipped off Officer Anderson.

29.    Immediately after seeing Mr. Sexton flipping off the car, Officer Anderson made an illegal U-turn across four lanes of traffic to contact Mr. Sexton and ask if he needed any help.

30.    Mr. Sexton told Officer Anderson that he did not need help, and Anderson began to drive away on 30th Street.

31.    As Officer Anderson drove away, Mr. Sexton looked both ways and, seeing no cars in the area, safely crossed 30th Street.

32.    Again, Officer Anderson made another illegal U-turn and drove toward Mr. Sexton, at which point Mr. Sexton began recording the incident on his phone.

33.    As Officer Anderson approached, Mr. Sexton flipped him off again while standing on the sidewalk.

34.    Immediately after Mr. Sexton flipped him off again, Officer Anderson activated the police lights on his car and pulled over.

35.    Officer Anderson jumped out of his vehicle and grabbed Mr. Sexton. Officer Anderson used force against Mr. Sexton within seconds of the initiation of the interaction. Officer Anderson pulled Mr. Sexton to the police car by his wrist and shoved Mr. Sexton against, and over, the hood of his vehicle.

36.    Though Mr. Sexton repeatedly asked Officer Anderson to please "calm down," he escalated the situation by using excessive force because he was angry that Mr. Sexton had flipped him off and filmed him. Officer Anderson pinned Mr. Sexton to the hood of the car and wrenched his arm behind his back. Mr. Sexton continued to tell Anderson that he was not

fighting him, indicated that he was not resisting arrest with his body language, and asked

Anderson not to rough him up.

37.     Officer Anderson placed Mr. Sexton in handcuffs and directed another officer to

search Mr. Sexton's pockets, even though there was no reason to suspect that he had a weapon or

had committed a crime.

38.     Officer Anderson asked Mr. Sexton, "why were you making obscene gestures the

whole time" while continuing to use force against him and detain him in handcuffs. During this

encounter, Mr. Sexton pointed out another individual crossing the street just as Mr. Sexton had

crossed the street. Though there were multiple officers on scene, no officers arrested or spoke

with the other individual.

39.     After a half an hour, Officer Anderson released Mr. Sexton from handcuffs and

issued a citation for jaywalking under COLO. SPRINGS MUN. CODE 10.18.104. Colorado Springs

prosecuted Mr. Sexton for almost three months before dismissing the charges against him for a

lack of probable cause.

40.     In a published decision on a motion to dismiss, Judge Brimmer held that Mr.

Sexton had valid claims against Defendant Anderson for the violation of his Constitutional

rights.

**Defendant Colorado Springs has a custom and practice of targeting Mr. Sexton for
engaging in speech that is critical of CSPD officers as evidenced by an incident on
January 30, 2019.**

41.     On January 30, 2019, Mr. Sexton was walking near the intersection of North

Nevada Avenue and East Bijou Street in downtown Colorado Springs, Colorado. As he was

walking, he observed two CSPD officers, Officers Raymond Lingley and Marvin Forbes,

operating a speed trap. Mr. Sexton began filming the officers. Mr. Sexton saw the officers

perform traffic stops on two vehicles. The officers pulled the vehicles over on the right side of

East Bijou Street, which is adjacent to Acacia Park.

    42.    Mr. Sexton lawfully crossed, in the crosswalk and with the traffic signal, Bijou

Street at Nevada Avenue. He walked along the sidewalk adjacent to the public park to the

location where the officers were performing their traffic stops. Mr. Sexton stopped on the

sidewalk, approximately fifteen feet from the officers. As he walked past Officer Lingley, Mr.

Sexton said "Feel good about that? Harassing and taxing. These are innocent civilians." Officer

Lingley called dispatch to request a patrol unit and then resumed performing his traffic stop.

Officer Lingley continued to interact with the motorist.

    43.    Mr. Sexton then continued down the sidewalk. As he did so, Mr. Sexton said  to

Officer Forbes, "doing your good deed for the day, you piece of shit?" Officer Forbes asked if he

could help Mr. Sexton. Mr. Sexton responded that Officer Forbes should continue doing his job

and that he would continue to stand on the sidewalk. Mr. Sexton criticized Defendant Forbes for

"playing hide and seek" to write people tickets for speeding.

    44.    As Officer Forbes performed the traffic stop, Mr. Sexton criticized Officer Forbes

for ticketing drivers for barely exceeding the speed limit. Officer Forbes told Mr. Sexton that he

could call the police station to file a complaint. Mr. Sexton said that Officer Forbes should do his

job right and then the public wouldn't have to file complaints. Mr. Sexton told Defendant Forbes

that police did not care about citizens but only about the "blue line." Officer Forbes asked,

"Would you like to be arrested for disorderly conduct" and told Mr. Sexton "you do not have the

right to stand here and yell." Mr. Sexton responded that he had a right to free speech.

45.     At one point, Officer Forbes approached Mr. Sexton and got right up into his face. When that happened, Mr. Sexton backed away from Officer Forbes and asked Officer Forbes to back up.

46.     Throughout the interaction with Officer Forbes, Mr. Sexton stood on the sidewalk. Mr. Sexton never came between Officer Forbes (or Officer Lingley) and the motorist he had pulled over. Mr. Sexton maintained a distance throughout the interaction and never left the sidewalk.

47.     Another CSPD officer, Officer William Giannini, arrived based on Officer Lingley's call for service. Defendant Giannini witnessed Mr. Sexton criticizing Officer Forbes. Officer Giannini heard Mr. Sexton yell "fuck the police." In response, Officer Giannini told Mr. Sexton that saying the word "fuck" in public is profanity and using that word violates the disorderly conduct statute.

48.     Officer Peter Tomitsch arrived shortly thereafter. Defendant Forbes told Officer Tomitsch that Mr. Sexton was criticizing him. Officer Tomitsch witnessed Mr. Sexton saying "fuck the police.".

49.     Officer Giannini read and showed Mr. Sexton the statute for disorderly conduct, and told him that he was violating it. Specifically, Officer Giannini told Mr. Sexton that he was violating the portion of C.R.S. § 18-9-106 that criminalizes anyone who "[m]akes a coarse and obviously offensive utterance, gesture, or display in a public place and the utterance, gesture, or display tends to incite an immediate breach of the peace."

50.     Mr. Sexton responded that he was acting lawfully and that the Supreme Court has said that saying the word "fuck" is protected speech.

51.     Officer Giannini told Mr. Sexton that saying the word "fuck" on a public street is
illegal. In response, Mr. Sexton reiterated that he had a First Amendment right to say "fuck the
police."

52.     While Mr. Sexton was explaining that he had a constitutional right to say "fuck
the police," Officers Roberto Williamson and Tracy Toth arrived and conferred with the officers
on-scene about Mr. Sexton's actions. Through this conferral, Officers Williamson and Toth
knew exactly the speech and actions that Mr. Sexton was being investigated for engaging in.

53.     Eventually, Officers Giannini and Tomitsch asked for Mr. Sexton's identification
and then arrested Mr. Sexton. They did so because Mr. Sexton said the word "fuck." As he was
being arrested and searched, Mr. Sexton told the officers he did not consent to search. He also
asked that they not turn off his camera.

54.     Officers Giannini and Tomitsch searched Mr. Sexton's pockets and backpack
even though they had no reasonable suspicion to believe that he had committed a crime or was
carrying a weapon. Defendant Williamson placed Mr. Sexton's possessions in a bag and
Defendant Toth opened the door to put Mr. Sexton in a patrol car.

55.     Despite the fact that it was clear to them that Mr. Sexton had violated no law (and
that there was no basis for searching his person), Officers Williamson, Toth, Lingley, and Forbes
did nothing to intervene to prevent Mr. Sexton's arrest and the searching of his person.

56.     After placing Mr. Sexton in handcuffs and then into a patrol car, Officer Tomitsch
requested supervisory backup. Defendant Scott Wisler responded to the scene. Officer Tomitsch
explained to Officer Wisler that Mr. Sexton was yelling "fuck the police" from the sidewalk and
that officers had arrested him for disorderly conduct. Officer Wisler approved of the arrest and

condoned his subordinates actions. Because of Officer Wisler's decision, Mr. Sexton continued
to be seized by the Officers and was not released from custody.

57.     Officer Wisler then told Mr. Sexton that he would receive a citation for disorderly
conduct and interference. Defendant Wisler instructed the other officers to take Mr. Sexton to the
Gold Hill Division CSPD Station to serve him with the charge of disorderly conduct.

58.     While they were charging Mr. Sexton with disorderly conduct, Officers Tomitsch
and Giannini concluded that Mr. Sexton did not violate the interference statute. They also
concluded that there was no probable cause to believe Mr. Sexton was obstructing an officer.
Because of these conclusions, Officers Tomitsch and Giannini did not charge Mr. Sexton with
either of these crimes. However, they instituted charges against him for disorderly conduct
despite it being obvious that Mr. Sexton had not committed the crime of disorderly conduct.

59.     After the arrest, Officers Williamson and Toth took witness statements from
individuals in the area. None of these individuals said that Mr. Sexton had caused a breach of the
peace. In fact, one interviewee, the only one who heard clearly what Mr. Sexton was saying, told
the officers that she heard Mr. Sexton saying the word" fuck" but that that word did not offend
her.

60.     Despite the fact that these interviews confirmed that Mr. Sexton had violated no
law, Officers Williamson and Toth did nothing to intervene to prevent the continued detention,
charging, and prosecution of Mr. Sexton.

61.     No pedestrians or nearby shop employees confronted Mr. Sexton while he was
speaking. No passerby walked across the street to question Mr. Sexton. No cars stopped to watch
Mr. Sexton. No one other than the officers on-scene talked to Mr. Sexton that day. The Officers

arrested Mr. Sexton for simply saying "fuck the police." The Officers arrested, searched, and charged Mr. Sexton with disorderly conduct because he would not change the content of his speech.

62.    Mr. Sexton faced prosecution for one year because of the Officers' unconstitutional arrest. On the eve of trial, the prosecution dismissed the case against Mr. Sexton because there was a lack of probable cause to believe that Mr. Sexton had committed any crime

**Defendant Colorado Springs has a custom and practice of arresting individuals in retaliation for their exercise of their First Amendment rights, particularly in response to criticism, and recording, of police activity.**

63.    CSPD has a history of retaliating against individuals who criticize police officers and/or record their misconduct—an issue that should have long since been addressed by Defendant Colorado Springs. The following cases show that at the time of the incident involving Plaintiffs, there was an informal custom and practice, that was known to Defendant Colorado Springs, of retaliating against individuals who protest police officers and/or record their misconduct. These cases also illustrate an obvious need, that Defendant Colorado Springs was aware of at the time of Mr. Sexton's arrest, for Defendant Colorado Springs to provide further training to CSPD officers on the necessity of not retaliating against individuals who protest police officers and/or record their misconduct.

64.    All of the acts described herein were done by Defendants Somersalmi and Nassar intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Plaintiffs' federally protected rights, and were done pursuant to the preexisting and ongoing deliberately indifferent custom, policy, practice, training, and supervision of Defendant Colorado Springs acting under color of state law.

65.     Upon information and belief, Defendant Colorado Springs has provided no additional training to Defendants Somersalmi and Nassar, and its other officers related to the incident with Plaintiffs.

66.     The unlawful conduct of Defendants Somersalmi and Nassar, as set forth in detail herein, amounts to a custom and widespread practice, even if not authorized by written law or express municipal policy, so permanent and well settled as to constitute a custom or usage with the force of law.

67.     Through the Defendant Colorado Springs' continuous ratification of unconstitutional detentions, arrests, prosecutions, excessive force, and stifling of free speech, Defendant Colorado Springs has condoned Defendants Somersalmi's and Nassar's conduct.

68.     Defendant Colorado Springs failed to properly train and supervise its employees to avoid inhibiting free speech and the use of excessive force, unlawful seizure, and unlawful search.

69.     Defendant Colorado Springs knew, or should have known, that its employees would retaliate against Plaintiffs for their free speech activity violating their constitutional rights.

70.     Defendant Colorado Springs was deliberately indifferent to Plaintiff's constitutional rights, because Colorado Springs knew that individuals in Plaintiff's position would be at a substantial risk of suffering dangerous consequences from Colorado Springs' failure to properly train and supervise its employees.

71.     Defendant Colorado Springs could have and should have pursued reasonable methods for the training and supervising of such employees but failed to do so.

72.     Defendant Colorado Springs' policies, customs, or practices in failing to properly train and supervise its employees were the moving force and proximate cause of the violation to Plaintiffs' constitutional rights.

73.     The custom, policy, and practice of Defendant Colorado Springs of encouraging, condoning, tolerating, and ratifying the retaliation, detention, use of excessive force by law enforcement officers and the unlawful seizure, search, and false arrest of citizens, as described herein were the moving force behind, and proximate cause of, the violation to Plaintiffs' constitutional rights.

74.     The acts or omissions of Defendant Colorado Springs caused Mr. Sexton damages in that he suffered physical and mental pain, among other injuries, damages, and losses.

75.     The actions of Defendant Colorado Springs as described herein deprived Mr. Sexton of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages

76.     On July 4, 2013, Grant Bloomquist was arrested without probable cause after he verbally protested two CSPD officers' beating of another man outside of a nightclub. Mr. Bloomquist walked outside of Cowboys Night Club in downtown Colorado Springs and saw officers brutally beating a black man, so said to the officers, "get the fuck off him." At that point, he was blindsided and struck by an officer, who hit him right in the face. Multiple CSPD officers then struck Mr. Bloomquist repeatedly in the groin area with knee strikes and pinned him against a police vehicle. The officers then threw him in the police car and arrested him. These actions were taken by CSPD officers because Mr. Bloomquist was criticizing the CSPD.

77.     On March 25, 2015, CSPD officers unlawfully arrested and brutalized Ryan Brown because he filmed a traffic stop, protested CSPD officers' misconduct during that traffic stop, and asserted his rights. Mr. Brown was in the passenger seat of a vehicle that was pulled over because his brother (the driver of the vehicle) and himself were black men driving through a predominantly white neighborhood in Colorado Springs. Once CSPD officers initiated the stop, Mr. Brown immediately asked them why the vehicle had been pulled over and started filming. In response to this free speech activity, the CSPD officers held Mr. Brown at gunpoint, forced him out of the vehicle, slammed him into a snowy parkway, and stopped his recording. These actions were taken by CSPD officers because Mr. Brown was criticizing the CSPD. Mr. Brown filed a lawsuit against Colorado Springs. Colorado Springs settled Mr. Brown's claims against the officers and itself.

78.     On November 2, 2017, Terrell Clayton was arrested for simply filming police activity in Colorado Springs and protesting police officers who attempted to intimidate him into taking actions he was not legally required to take, namely providing CSPD officers with identification. On that day, Mr. Clayton drove to the CSPD substation at 7850 Goddard Street, Colorado Springs, Colorado. Mr. Clayton set out to film officers, and the station itself, for his YouTube channel. To do so, he carried with him a handheld camera and his cellphone. Mr. Clayton was filming outside of the substation when he was approached by two CSPD officers. When they approached Mr. Clayton, the officers almost immediately asked Mr. Clayton for identification. Mr. Clayton politely refused, correctly informing the officers that they needed reasonable suspicion that he had committed a crime in order to demand identification from him. One officer responded that the officers had reasonable suspicion that Mr. Clayton had committed

a crime because he was "outside of a law enforcement facility acting suspicious." He falsely told

Mr. Clayton that acting "suspicious" meets the elements of the crime of disorderly conduct. They

then told Mr. Clayton that he was "required" to identify himself. Mr. Clayton told the officers

that he had a constitutional right to record police activity and that he would not produce

identification without reasonable suspicion that he had committed a crime. Immediately after Mr.

Clayton's assertion of his rights, the officers forcibly detained him. They aggressively searched

Mr. Clayton and seized his camera, placing it on the trunk of the police car. The officers then

placed Mr. Clayton in the back of their police car. While in the back of the police car, Mr.

Clayton began filming on his cell phone. As one of the officers was speaking to Mr. Clayton,

while Mr. Clayton was detained against his will in the back of the police car, the officer falsely

told Mr. Clayton that his detention was a *Terry* stop. The officer then seized Mr. Clayton's cell

phone and stopped his recording. Unbeknownst to the officers, Mr. Clayton's camera (which had

been seized initially by the officers and placed on the trunk of their police car) was continuing to

film. On film, the officers stated that, if Mr. Clayton didn't provide his identification, they were

going to book him into jail. Sergeant Pratt then told the other officers that he didn't want to hear

Mr. Clayton "barkin' laws and all that." Sergeant Pratt then, seemingly knowing that his

detention of Mr. Clayton was unconstitutional, told the other officers that "if this ends up going

to the court bullshit... then literally fuck my life." Sergeant Pratt then told Officer Pugsley to

"keep him detained out here." The officers eventually told Mr. Clayton that he had a choice:

either provide his name and identification or spend the evening in jail. Despite his belief that the

officers had no reasonable suspicion to require him to produce identification, Mr. Clayton

eventually provided the officers with his identification so as to avoid spending the night in jail.

He was then released with no citation. Mr. Clayton has never been cited, or charged, with any

crime arising out of the incident on November 2, 2017. CSPD officers retaliated against Mr.

Clayton because of his video auditing of them, which they perceived as critical of the CSPD.

79.    Several of these representative cases resulted in the City of Colorado Springs

paying hundreds of thousands of dollars to settle retaliation claims, yet the facts surrounding Mr.

Sexton's case make apparent that the CSPD has yet to learn its lesson and adequately train its

officers on the requirements of the First Amendment.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Violation
### Free Speech

80.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

81.    At all times relevant to this Complaint, Defendants were acting under the color of

law.

82.    Plaintiffs were engaged in First Amendment-protected speech by filming and

criticizing the police.

83.    Plaintiffs' speech was on a matter of public concern and did not violate any law.

84.    By using force against Plaintiffs, Defendants chilled Plaintiffs from exercising

their First Amendment rights.

85.    Defendants' use of force was a content-and/or viewpoint-based restriction on

Plaintiffs' speech.

86.    Plaintiffs' speech occurred at a traditional public forum.

18

87.    Defendant Nassar failed to intervene to prevent Defendant Somersalmi from violating Plaintiffs' First Amendment rights.

88.    Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

89.    Defendants' actions were in accordance with the customs, policies, practices, and training of Defendant Colorado Springs.

90.    Defendant Colorado Springs has a custom, practice, and policy of tolerating violations of the First Amendment of the United States Constitution related to Mr. Sexton.

91.    Defendant Colorado Springs' customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiffs' constitutional rights.

92.    Defendants' actions and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages in that they were prevented from speaking freely on a matter of public concern, among other injuries, damages, and losses.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Retaliation

93.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

94.    At all times relevant to this Complaint, Defendants were acting under the color of law.

95.    Plaintiffs were engaged in First Amendment-protected speech.

96.    Plaintiffs' speech was on a matter of public concern.

97.    Defendants responded to Plaintiffs' First Amendment-protected activity with retaliation.

98.    Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of their First Amendment rights.

99.    Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in First Amendment-protected activity.

100.    Defendants' conduct violated clearly established rights belonging to Plaintiffs of which reasonable persons in Defendants' position knew or should have known.

101.    Defendant Nassar failed to intervene to prevent Defendant Somersalmi from violating Plaintiffs' First Amendment rights.

102.    Defendant Colorado Springs has a custom, policy, or practice of tolerating violations of the First Amendment of the United States Constitution related to Mr. Sexton.

103.    Defendant Colorado Springs' customs, policies, practices, and training were the moving force behind Defendants' violation of Plaintiffs' constitutional rights.

104.    Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

105.    Defendants' action and/or omissions caused, directly and proximately, Plaintiffs to suffer damages. The acts and inactions of Defendants caused Plaintiffs damages.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — Fourth Amendment Violation**
**Excessive Force**

106.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

107.     Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

108.     Defendants are "persons" under 42 U.S.C. § 1983.

109.     Plaintiffs had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

110.     Defendants did not have, at any time, a legally valid basis to seize Plaintiffs through the use of force.

111.     Defendants unlawfully seized Plaintiffs by means of excessive physical force.

112.     Defendant Nassar failed to intervene to prevent Defendant Somersalmi from violating Plaintiffs' constitutional rights.

113.     Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

114.     Plaintiffs gave the officers no reason to fear for their safety.

115.     Plaintiffs were obviously unarmed.

116.     Plaintiffs were not resisting arrest or fleeing.

117.     Defendants did not have a legally valid basis to seize Plaintiffs in the manner and with the level of force used under the circumstances presented.

118.     Defendants recklessly created the situation in which they used force.

119.     At the time when the Defendants used excessive force against Plaintiffs, Plaintiffs had a clearly established constitutional right under the Fourth Amendment to the United States

Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

120.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

121.    Defendant Colorado Springs has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

122.    The actions Defendants were authorized (before and during the fact), and ratified (after the fact), by Defendant Colorado Springs.

123.    Defendant Colorado Springs' customs, policies, and/or practices, and the decisions of its final policymakers, were the moving force behind Defendants' violation of Plaintiffs' constitutional rights.

124.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiffs suffered injuries, damages, and losses.

125.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses.

126.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiffs of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## FOURTH CLAIM FOR RELIEF[1]
### C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 10
### Freedom of Speech

---

[1] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

**(Plaintiffs against Defendants Somersalmi and Nassar)**

127.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

128.    The Individual Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

129.    The Individual Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

130.    The Free Speech Clause to the Colorado Constitution provides that "[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact." Colo. Const. Art. II, Section 10.

131.    The free speech rights protected by Colo. Const. Art. II, Section 10 are more expansive than those protected by the First Amendment to the United States Constitution.

132.    Plaintiffs were engaged in free speech activity.

133.    The actions of the Individual Defendants can be expected to chill a reasonable person from engaging in activity protected by Colo. Const. Art. II, Section 10.

134.    Plaintiffs' expression was on a matter of public concern and did not violate any law.

135.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiffs' expression.

136.    Defendants' actions were not a reasonable time, place, and manner restriction on speech.

137.    Defendants jointly and on their own accord responded to Plaintiffs' Colo. Const. Art. II, Section 10 protected activity with retaliation, including but not limited to use of physical force.

138.    By unlawfully using force against Plaintiffs, Defendants sought to punish Plaintiffs for exercising their Colo. Const. Art. II, Section 10 rights, to silence them, and to deter them from speaking in the future. Defendants' retaliatory actions would chill a person of ordinary firmness from engaging in such Colo. Const. Art. II, Section 10 protected activity.

139.    Defendants' retaliatory actions were substantially motivated by Plaintiffs' exercise of their Colo. Const. Art. II, Section 10 rights.

140.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's Colo. Const. Art. II, Section 10 rights.

141.    Defendant Nassar failed to intervene to prevent Defendant Somersalmi from violating Plaintiffs' constitutional rights.

142.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

143.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

**FIFTH CLAIM FOR RELIEF**[2]
**C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 7**
**Excessive Force**
**(Plaintiffs against Defendants Somersalmi and Nassar)**

144.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

145.    The Individual Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers at all times relevant to the allegations in this Complaint.

146.    The Individual Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

147.    Plaintiffs had a protected interest under Colo. Const. Art. II, Section 7 against being victimized by the use of excessive force at the hands of law enforcement personnel.

148.    The Individual Defendants unlawfully seized Plaintiffs by means of excessive physical force.

149.    The Individual Defendants had no warrant authorizing any seizure of Plaintiffs.

150.    Each of the Individual Defendants failed to intervene to prevent the other Defendants from violating Plaintiffs constitutional rights and is thereby liable for such failure to intervene.

151.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them

---

[2] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

152.    Plaintiffs had committed no crime (nor could any Defendant have reasonably believed they had committed any crime) that would legally justify the amount of force used by Defendants, Plaintiffs gave the officers no reason to fear for their safety, Plaintiffs were obviously unarmed, and Plaintiffs were not resisting arrest or fleeing.

153.    Defendants did not have a legally valid basis to seize Plaintiffs in the manner and with the level of force used under the circumstances presented.

154.    Defendants recklessly created the situation in which they used force.

155.    Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

156.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiffs' constitutionally protected rights.

157.    Defendant Nassar failed to intervene to prevent Defendant Somersalmi from violating Plaintiffs' constitutional rights.

158.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiffs suffered injuries, damages, and losses.

159.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiffs suffered during and after the vigil, and other compensatory and special damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law, including, but not limited to the following:

a.  All appropriate relief at law and equity;

b.  Declaratory relief;

c.  Injunctive relief;

d.  Actual economic damages as established at trial;

e.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

f.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g.  Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

    1.  Issuance of a formal written apology from each Defendant to Plaintiff;

    2.  The imposition of policy changes designed to avoid future similar misconduct by Defendants;

    3.  Mandatory training designed to avoid future similar misconduct by Defendants;

h.  Pre-judgment and post-judgment interest at the highest lawful rate;

i.  Attorney's fees and costs; and

j.  Such further relief as justice requires.

## **REQUEST FOR TRIAL BY JURY**

Plaintiff demands a jury trial on all issues so triable.

Dated this 1st day of March, 2023.

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*

_____

Andy McNulty
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001

ATTORNEY FOR PLAINTIFF